## AMERICAN NATIONAL BANK OF MACON *v.* WARD, administratrix of Hinson; *et vice versa.*

1. There was no error in overruling the demurrer to the defendant's amended answer.

2. If a maker of a note made it payable to his own order, indorsed it in blank, and transferred it to another; and if the holder offered the note to a trading corporation in payment for some of its stock, provided that the note should be received without the indorsement of the holder, and the company declined to receive it without such indorsement, but did not return the note to the holder, in a suit subsequently brought against the maker by a bank as the holder of such note, the maker could inquire into the title of the bank for the purpose of setting up as a defense that the note was the property of the original holder, that the maker had paid it to him though it was not at the time in his possession, and that the bank was not a bona fide taker for value, before due, and without notice, so as to be protected against such defense.

   (a) The maker would not be prevented from inquiring into the title of the bank for the purpose of setting up such defense, although it appeared that he paid the note before maturity, that the original holder represented that it was in the possession of the company to which he had offered it as payment on condition that it should be received without his indorsement, or of the bank, and agreed to indemnify the maker if a judgment should be obtained against him on the note.

3. The charge of the court as a whole was as favorable to the plaintiff as it could demand. Some of the requests to charge were so worded that it would have been error to give them as presented. So far as pertinent and proper, they were sufficiently covered by the general charge. There was no error of omission or commission, for any of the reasons assigned in the motion for a new trial, which requires a reversal.

   (a) It is not good practice to mark passages in law books and hand them to the court as requests to charge.

   (b) The evidence was sufficient to authorize the verdict, and there was no error in overruling the motion for a new trial.

                    JULY 14, 1916.

Complaint. Before Judge Highsmith. Jeff Davis superior court. May 10, 1915.

The American National Bank of Macon brought suit against Elias Hinson on two promissory notes, each for $2,500 principal,

with interest at five per cent., dated December 11, 1911, one due on October 1, 1912, and the other due on November 1, 1912. Each of them stated that "I jointly and severally promise to pay to myself or order twenty-five hundred and no/100 dollars, at any bank, for value received, being a bona fide loan of money, with interest at five per cent. per annum from date until paid." Each of these notes was indorsed in blank by Elias Hinson, and by "Brown Wagon Company, per B. B. Taylor, Secy. and Treas." The defendant pleaded, among other things, as follows: Prior to the maturity of the notes they were purchased by B. H. Tanner, who was the owner of them at maturity. He entered into negotiations with the Brown Wagon Company of Macon for certain stock in that company, and offered to pay therefor by selling the notes sued on to that company, upon the agreement that he would not purchase the stock unless the company would accept the notes as full payment therefor, without his indorsement. The company refused to accept the notes in payment of the stock unless Tanner would indorse them, which he refused to do; and the trade, whereby the notes were to be exchanged for the stock, was never consummated, and the title to the notes remained in Tanner. Before the notes had been returned to Tanner the president of the company died, the notes being left upon his desk. Immediately after his death the affairs of the company were placed in charge of auditors to be checked, and its financial condition ascertained, the transaction of business being suspended. The auditors took possession of the notes, and delivered them to the American National Bank, which received them without any indorsement of the Brown Wagon Company; but the indorsement of that company appearing on the notes was placed there some days later by the secretary and treasurer, on request of the bank, and over his protest that such indorsement was worth nothing. The secretary and treasurer had no authority to make such indorsement at that time. The bank was informed, before the death of the president of the Brown Wagon Company, of the negotiations with Tanner, that the latter refused to indorse the notes, and that no trade had been made. The defendant paid the notes to Tanner, who was the true and lawful owner.

The following, among other facts, appeared: Tanner entered into negotiations with a person representing the Brown Wagon

Company, with a view to purchasing stock in that company, and agreed to take such stock if the company would accept the Hinson notes in payment therefor, without his indorsement. He signed a stock subscription containing the following: "I hereby subscribe for 50 shares of the preferred capital stock of the Brown Wagon Company, at $100 per share, including a bonus of fifty per cent. common stock, and enclose $—— cash [written between the lines are the words, "exchange two notes attached"] and $—— note in full payment therefor. As soon as all notes and other evidences of indebtedness are paid in full as agreed, certificates for said stock shall be delivered to me by the company. Purchaser to [be] elected director of the company." There were other terms as to the right of the company to reject any subscription, and as to allotment in case of oversubscription. The representative of the company gave to Tanner a receipt for the two Hinson notes, stating that they were "to be offered to Brown Wagon Company in payment of $5,000 preferred stock; if not accepted, to be returned to B. H. Tanner." Two days later the president of the company wrote to Tanner a letter in which, referring to the notes, he stated that "we can accept these for the $5,000 as face of the amount, provided, of course, you will indorse same, it bearing your signature. The banks here in Macon will gladly and willingly take the paper with your indorsement; otherwise, they do not feel inclined to handle it," etc. Shortly thereafter the president of the company died, leaving the notes on his desk. He owned a large part of the stock of the company. After his death his brother-in-law, W. J. Massee, proceeded to represent the widow (who, he testified, was a large stockholder, and also a creditor). Under agreement between him and the secretary and treasurer, an auditor or auditors were appointed to investigate the condition of the company, which was not then transacting active business. Mr. Massee was not a stockholder or officer of the company, but testified that he acted in an advisory capacity, and consulted with the secretary and treasurer. The secretary and treasurer testified that Mr. Massee took charge of the notes and delivered them to the auditors. The testimony was conflicting as to the transaction by which the bank became possessed of the notes. Some of the evidence tended to show that Mr. Massee negotiated with the officers of the bank in regard to discounting the Hinson

notes, so as to provide for the payment of notes due to the bank by the wagon company, and they knew that he was not an officer or stockholder in the company. The testimony of the secretary and treasurer of the company tended to show, that the bank, through its officer or officers, was affected with notice that the trade with Tanner had not been completed, that no one then had authority to complete it, "and they were Mr. Tanner's notes," and that the secretary and treasurer did not think that they should be handled; that he indorsed the company's name upon the notes some days after the bank received them, at the request of an officer of the bank, who stated that they wanted to know from whom the bank received them; that the secretary and treasurer stated that he would place the indorsement upon them, but he did not think it amounted to anything; and that the wagon company was insolvent at the time when the bank received the notes, and was placed in bankruptcy in less than ten days afterward, and within two or three days after he had indorsed the notes. This witness also testified that the money received from the bank was about $150 or $200, which was paid to the auditors for expenses. There was other testimony, indicating that, after the death of the company's president, Tanner wrote for the notes.

The evidence on behalf of the bank tended to show, that it discounted the Hinson notes upon the agreement that a large part of the proceeds would be applied to the taking up of maturing notes of the wagon company, which was done, and a balance in cash was paid by the bank; that the negotiation was with Mr. Massee, or the secretary and treasurer under his advice; that the banking business of the wagon company continued while the auditing was in progress; that the bank took the notes without notice of any title or right in Tanner, if there was any, and without knowledge of the insolvency of the wagon company. Other evidence need not be set out.

The jury found in favor of the defendant. The plaintiff moved for a new trial, which was refused, and it excepted. It also assigned error on the overruling of objections to an amendment made to the answer and to the overruling of a demurrer to the amended answer.

*Hardeman, Jones, Park & Johnston,* for plaintiff.

*J. W. Quincey, L. E. Heath,* and *Lankford & Moore,* for defendant.

LUMPKIN, J.   (After stating the foregoing facts.)

1.   There was no error in overruling the objections to the allowance of the amendment to the defendant's answer, or the demurrer to the answer as amended.

2.   It was contended by counsel for the plaintiff in error that Hinson could not inquire into the title of the bank to the note sued on.   By the Civil Code (1910), section 4290, it is declared that the title of the holder of a note can not be inquired into, unless it is necessary for the protection of the defendant, or to let in the defense which he seeks to make.   The defendant sought to protect himself against a recovery by the plaintiff, by setting up that Tanner was the real owner of the notes; that the bank was not a bona fide holder for value and without notice, but took the notes with notice of his rights; that the delivery to the bank was illegal; and that the defendant paid the notes to Tanner, the lawful owner of them.   In order to set up payment to Tanner as a defense to the suit by the bank, it was necessary for the defendant to inquire into the title of the bank.   Thus the case falls within the terms of the code section above cited.   In *Paris* v. *Moe,* 60 *Ga.* 90, it was held that where a negotiable promissory note indorsed in blank is put in suit by a third person, the production of the note by the plaintiff at the trial is prima facie evidence that he acquired it for value before maturity, and without notice of any fact going to defeat its collection.   It was said: "As against him, payment made to the payee will not be a defense without showing that the payee had possession of the note at the time, or was then the owner of it, or for some other reason had a right to receive the money." In the opinion it was said, referring to payment made to the payee: "The burden of proving his right or authority must rest on the defendants."   But no such burden could be carried without an inquiry into the title of the plaintiff, who was in physical possession of the note.

It was urged, that, Hinson having voluntarily paid the notes to Tanner before maturity, with knowledge that they were not in his possession but were in possession of the bank, and with an agreement on the part of Tanner to indemnify him if a judgment should be recovered against him, he could not inquire into the title of the bank, and that this was not for his protection, but for that of Tanner.   We can not concur in this argument.   Hinson testified

that Tanner told him that the notes were held by the Brown Wagon Company, and did not say they were held by a Macon bank. Tanner testified that he had the notes, and they were with the Brown Wagon Company (or in the bank, the evidence is not clear which); that he told Hinson where they were, and that he would give a receipt against them; and that if a judgment was recovered against Hinson, he agreed to pay it. Hinson was interested in setting up the defense of payment. If a judgment should be rendered against him, it could be enforced against his property, and he would have to look to Tanner to indemnify him. The agreement with Tanner did not make Hinson a party with no interest. To give an illustration, suppose that a thief should purloin a note from the payee, that the latter should insist on payment from the maker, informing him of the fact, and agreeing to indemnify him in case he should be sued on the note and a recovery be had. If the maker should make payment to the payee, he would do so at the risk of being sued; but this would not prevent his defending against a suit on the note brought by another, by showing that the plaintiff had no title to the note, and was not a bona fide holder for value before due and without notice. He would be interested in setting up the defense and be authorized to inquire into the title of the plaintiff. The facts involved in *Atkins* v. *Cobb,* 56 *Ga.* 86, 88, were different from those in the present case. It was there sought to set up that the plaintiffs took the bill on which suit was brought on speculation; and the payees were making no contest with the plaintiffs. Moreover, the defendants were allowed to defend as fully as if the bill had not been negotiated, on the ground that it had been received by the plaintiffs after maturity. Nor were the cases of *Greer* v. *Woolfolk,* 60 *Ga.* 623, and *Haug* v. *Riley,* 101 *Ga.* 372 (29 S. E. 44, 40 L. R. A. 244), like the one now under consideration.

It was further urged that a verdict for the plaintiff was demanded, because the Brown Wagon Company discounted the notes, and thereby accepted the proposition of Tanner. But the evidence did not sustain that contention. On the contrary, it showed that the wagon company declined to accept the notes without an indorsement. If after this, and with no further notice to him, the company had nevertheless sold or discounted them, it could not have bound Tanner by so doing, as by an acceptance. Perhaps

he might have had an option to reclaim his notes, if they had not passed into the hands of an innocent purchaser without notice, or to sue for damages, or to assert that the use of the notes would bind the company in spite of its former refusal. But he has not sought to set up that the company was thus bound; nor does the evidence show that the wagon company itself, or any person authorized by it to accept Tanner's proposal has done so.

3. In this State what is known as the uniform negotiable-instrument law has not been adopted, as it has been in many States. The rights of holders of negotiable instruments are dealt with in the Civil Code (1910), § 4286 et seq. See especially §§ 4288, 4291, on the subject of notice to a purchaser of a negotiable instrument before due, and *Fidelity Trust Co.* v. *Mays,* 142 *Ga.* 821 (83 S. E. 961). The general charge of the court, contained in the record, shows that it was to some extent along the line indicated in *Matthews* v. *Poythress,* 4 *Ga.* 287. In its entirety it was quite as favorable to the plaintiff as the plaintiff had a right to demand; and, when considered in the light of the evidence and of the charge as a whole, none of the grounds of the motion for a new trial show any cause for a reversal. Some of the requests to charge were so worded that it would have been error to give them, even if the legal principles sought to be invoked were pertinent. In so far as they were proper, they were sufficiently covered by the general charge.

The practice of marking sentences or expressions in an opinion of the court printed in the official reports, and handing them to the trial court as requests to charge, can not be commended. If this practice were generally adopted, counsel might carry many volumes of reports into the court-house, marked here and there, sometimes at various points in a long printed opinion, and hand to the court his legal authorities thus marked, as requests to charge. It is evident that the court would often be compelled to read many pages of the book or books in order to gather the context and to ascertain whether the particular parts marked were proper to be taken from their surroundings and given in charge. In the present case one ground of the motion for a new trial assigned error because the court erred in refusing "the following request to charge, the same being set forth in a decision by the Court of Appeals, the court having been furnished with the decision, and

the language quoted having been appropriately marked, before the jury retired to consider their verdict." (Then follows what appears to be a quotation from the decision.) Another ground is in the same form, except that a decision of the Supreme Court of Georgia is referred to, instead of one of the Court of Appeals. Even the volume and page are not mentioned, if, indeed, that would suffice. *Houser* v. *State, 58 Ga.* 78 (2).

Upon the whole case we find no cause for a reversal. As the judgment complained of in the main bill of exceptions is affirmed, the cross-bill of exceptions is dismissed.

*Judgment on main bill of exceptions affirmed. Cross-bill of exceptions dismissed. All the Justices concur.*